Michelle HOEPFL, Plaintiff

v.

Haven J. BARLOW, M.D. and Healthplus,
Inc., Defendants.

Civ. A. No. 95–903–A.

United States District Court,
E.D. Virginia,
Alexandria, Virginia.

Nov. 2, 1995.

Lynn Perry Parker, Robins, Kaplan, Miller & Ciresi, Washington, DC, for Plaintiff.

Tara M. McCarthy, Merrifield, VA, for Haven J. Barlow, M.D.

Mark C. Hansen, James E. Boasberg, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, Ronald L. Lord, Gardner, Carton & Douglas, Washington, DC, for HealthPlus, Inc.

## MEMORANDUM OPINION

ELLIS, District Judge.

■ This case presents the question, novel in this circuit, of whether allegations of past discrimination alone establish standing to sue for injunctive relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.* Plaintiff seeks ADA injunctive relief against defendant on the basis of allegations that defendant, a physician, refused to perform surgery on plaintiff because she is HIV positive. She has since had the surgery performed by another physician, but nonetheless still seeks an injunction against this defendant under the ADA ordering him not to discriminate against other disabled persons in the future. For the reasons that follow, plaintiff's allegations of past discrimination do not provide her with standing to sue for injunctive relief under the ADA.

### I.[1]

Plaintiff Michelle Hoepfl, now a resident of North Carolina, had breast implant surgery in 1989. She is HIV positive. Defendant Haven J. Barlow, M.D. is a licensed physician practicing surgery in Virginia.

In 1993, Ms. Hoepfl, then a Virginia resident, began to experience breast pain, joint stiffness, skin rashes, and chronic fatigue. An MRI revealed that her breast implants had ruptured. She immediately began a search for a doctor who was both covered by her insurance[2] and qualified to remove the implants. After being referred to him by Healthplus, Ms. Hoepfl met with Dr. Barlow in July of 1994 to discuss her condition and the possibility of Dr. Barlow treating it. At some point in the examination, Ms. Hoepfl disclosed her HIV-positive status to Dr. Barlow. He then replied that he would "not touch an HIV patient with a ten-foot pole." This comment shocked Ms. Hoepfl and caused her to become visibly upset. Yet, in a parting remark made as he accompanied Ms. Hoepfl back to the waiting room a few minutes later, Dr. Barlow offered to treat her if no one else would. Dr. Barlow's secretary then followed up with a telephone call to Ms. Hoepfl in which the secretary offered to set an appointment for Dr. Barlow to perform the surgery Ms. Hoepfl needed.

---

1. The relevant and dispositive facts are not in dispute.

2. Healthplus, Inc. ("Healthplus"), Ms. Hoepfl's health insurance carrier, is also a defendant in this suit. Healthplus presented a motion to dismiss to another judge in this division on October 6, 1995. The motion was denied, though it appears that the issue of standing was not specifically addressed in that ruling.

According to Ms. Hoepfl, Dr. Barlow's parting statement to her and the follow-up phone call were not enough to overcome the extremely negative impact of his earlier statement about AIDS patients. She therefore persevered in her search for a physician to remove her breast implants. In the meantime, her pain continued. In addition, she felt intense anxiety about the surgery becoming more risky as time passed and her T-cell blood count dropped. This anxiety led to insomnia and depression, both of which became so severe that she sought counselling. Meanwhile, her search for a physician finally succeeded, and the surgery was performed on October 31, 1994.

The complaint alleges that Dr. Barlow's "ten foot pole" statement to Ms. Hoepfl during the examination violated the ADA, 42 U.S.C. § 12101 *et seq.* (Count I) and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (Count II) and amounted to the negligent and intentional infliction of emotional distress under state law.[3] At issue here is Ms. Hoepfl's ADA claim. As she conceded at oral argument, compensatory damages are unavailable under the plain language of the ADA. *See* 42 U.S.C. § 12188(a)(1), 42 U.S.C. § 2000a–3(a); *see also Aikins v. St. Helena Hospital,* 843 F.Supp. 1329, 1338 (N.D.Cal. 1994); *Mayberry v. Von Valtier,* 843 F.Supp. 1160, 1167 (E.D.Mich.1994). Hence, if she is to win any relief under the ADA, it must be in the form of an injunction. Ms. Hoepfl currently takes the position that her ADA claim is a request for injunctive relief ordering Dr. Barlow not to discriminate against disabled individuals in the future.

## II.

Congress determined in 1990 that "discrimination against individuals with dis-

abilities continue[s] to be a serious and pervasive social problem," and that these persons "have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society." 42 U.S.C. § 12101(a)(2), (7). On the basis of these and similar findings, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA thus specifically prohibits discrimination against disabled persons (i) in employment,[4] (ii) in the provision of public services,[5] and (iii) in the enjoyment of public accommodations.[6] Ms. Hoepfl's complaint falls under the third category, which statutorily defines "public accommodations" to include doctors' offices. *See* 42 U.S.C. § 12181(7)(F) (including "professional office of a health care provider" as public accommodation). She alleges that Dr. Barlow's statements to her amounted to a denial of her right to benefit from the professional services offered at his office. If proved at trial, such a denial would constitute discrimination under the ADA.[7] *See* 42 U.S.C. § 12182(a), (b)(1)(A)(i).

The public accommodations subchapter of the ADA does not itself set forth a remedial scheme. Rather, it provides that the remedies set forth in 42 U.S.C. § 2000a–3(a) are the remedies available for discrimination in public accommodations. *See* 42 U.S.C. § 12188(a). This statute is the remedial provision of the Civil Rights Act of 1964; it provides only "for preventive relief, including an application for a permanent or temporary injunction." *See* 42 U.S.C. § 2000a–3(a). The task at hand is to determine whether this definition fits the facts at bar.

---

3. For reasons not relevant here, the Court, pursuant to Rule 12, Fed.R.Civ.P. and by Order dated August 18, 1995, dismissed the negligent and intentional emotional distress counts for failure to state claims on which relief could be granted. The Rehabilitation Act claim survived a motion to dismiss.

4. *See* 42 U.S.C. §§ 12111–12117.

5. *See* 42 U.S.C. §§ 12131–12165.

6. *See* 42 U.S.C. §§ 12181–12189.

7. It is now settled law that HIV-positive individuals are "disabled" within the meaning of the ADA. *See, e.g., Howe v. Hull,* 873 F.Supp. 72, 78 (N.D.Ohio 1994); *Gonzales v. Garner Food Services Inc.,* 855 F.Supp. 371, 374 n. 5 (N.D.Ga. 1994); *United States v. Morvant,* 843 F.Supp. 1092, 1093–94 (E.D.La.1994); *T.E.P. v. Leavitt,* 840 F.Supp. 110, 111 (D.Utah 1993); *see also* 28 C.F.R. § 36.104.

To begin with, the discrimination Ms. Hoepfl allegedly suffered occurred entirely in the past. Moreover, because she now resides in a different state, it is highly unlikely that she will ever again be in a position where any discrimination by Dr. Barlow against disabled individuals will affect her personally. Thus, the precise issue presented here is whether a plaintiff alleging a past violation of § 12182 may sue for injunctive relief under the ADA without also showing a realistic possibility that any discriminatory conduct by the defendant in the future would cause the plaintiff harm.

### III.

■ Because "federal injunctive relief is an extreme remedy," *Simmons v. Poe,* 47 F.3d 1370, 1382 (4th Cir.1995), courts have erected a number of barriers a plaintiff must overcome before she is entitled to an injunction. For instance, an injunction will not issue unless the right to relief is clear.[8] And, it is axiomatic that a plaintiff cannot establish a clear right to a federal remedy without first meeting the threshold requirement of standing to bring her suit. It is this threshold requirement that is at issue here.[9]

■ The doctrine of standing is not without its perplexities, owing in substantial part to the doctrine's origins in the language of the Constitution. Article III mandates that federal courts sit only to decide true "cases or controversies." U.S. Const. art. III. This phrase has been interpreted to prohibit federal courts from hearing disputes that are not "consistent with a system of separate powers and ... traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

Specifically, in order to make out a "case or controversy," a plaintiff must demonstrate the existence of three elements: (1) that she has suffered an injury in fact, (2) that her injury was caused by the defendant's conduct, and (3) that her injury is capable of being redressed by a favorable ruling from the federal court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). These factors ensure that the federal courts confront only concrete disputes, ones that are live and ripe for adjudication, rather than mere requests for advisory opinions. The standing requirements also ensure that courts can indeed resolve the live disputes consistently with the judiciary's legitimate and limited role, thereby avoiding usurpation of legislative or executive functions.

■ In suits involving injunctive relief, this mandate of a live dispute translates into the requirement that a plaintiff face a threat of present or future harm. *Lyons,* 461 U.S. 95, 103 S.Ct. 1660 (1984). In other words, established standing rules preclude a plaintiff from obtaining injunctive relief based only on events that occurred in the past, even if the past events amounted to a violation of federal law. In *Lyons,* for example, the plaintiff was injured when Los Angeles police officers used an allegedly unprovoked and unnecessary chokehold on him during a routine traffic stop. In addition to damages under 42 U.S.C. § 1983, the plaintiff sought injunctive relief to prohibit the Los Angeles Police Department ("LAPD") from using chokeholds except where the proposed victim reasonably appeared to be threatening the immediate use of bodily force. *Lyons,* 461 U.S. at 97–98, 103 S.Ct. at 1662–63. On these facts, the Supreme Court held that Lyons had no

---

8. *E.g., Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985); *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 389 (7th Cir.1984); *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir. 1984); *see also* 11A *Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure* § 2942 (1995).

9. Of course, there are additional prerequisites to injunctive relief beyond that imposed by the doctrine of standing. For example, a plaintiff seeking an injunction must ordinarily show that she

faces the threat of an immediate and irreparable injury. *See, e.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983); *Simmons,* 47 F.3d at 1382; *Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370, 1382 (E.D.Va1993). Whether Congress removed this requirement by specifically authorizing injunctive relief under the ADA is an interesting question that need not be reached here, given the Court's conclusion that Ms. Hoepfl does not have standing to sue for the injunctive relief she seeks.

standing to seek an injunction because, given the very remote possibility that he would ever again be subjected to a chokehold by the LAPD, he had failed to make out a live case or controversy with respect to injunctive relief. *Id.* at 102–05, 103 S.Ct. at 1665–67. In the Supreme Court's words, the operative principle is that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by continuing, present adverse effect." *Id.* at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). Rather, the Supreme Court made quite clear that a plaintiff must show that her injury is both "real and immediate" to establish the "personal stake in the outcome" necessary for the proper resolution of important federal questions. *Lyons*, 461 U.S. at 101, 103 S.Ct. at 1665.

The Supreme Court cast its *Lyons* decision in terms of the "injury in fact" requirement. Yet, it might more logically be recast as an application of the redressability aspect of standing. In any event, the Supreme Court's rationale in *Lyons* is that a person does not have standing to seek an injunction unless there is reason to believe she would directly benefit from the equitable relief sought. There is little doubt that Ms. Hoepfl's allegations, taken as true on a motion to dismiss, demonstrate that she suffered an injury attributable to Barlow's conduct during the examination. But, as in *Lyons*, a past injury, without more, is not a sufficient basis for the issuance of injunctive relief. Put another way, an injunction cannot remedy Ms. Hoepfl's past injury. While the knowledge that Dr. Barlow was subject to an injunction might give Ms. Hoepfl some sense of personal satisfaction, the injunction could not provide her with a remedy for the pain and anxiety she suffered as she watched her T-cell count drop and continued to search for a surgeon to perform the operation she needed. Put another way, Ms. Hoepfl's prospect of obtaining relief for her injury as a result of an injunction in this case is simply too speculative. *See Allen v. Wright*, 468 U.S.

737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (noting that plaintiff has no standing if prospect of obtaining relief for injury as result of favorable ruling is too conjectural).

Ms. Hoepfl nonetheless asserts that the purposes behind the ADA can be fulfilled only if private citizens who have endured discrimination are allowed to obtain injunctive relief to prevent the perpetrators from continuing their discriminatory conduct. She thus urges that § 12188 be construed as if Congress, when it explicitly granted ADA plaintiffs the power to request an injunction, thereby implicitly provided that the common law rules on standing should not apply in ADA cases. More generally, she claims that where the legislature has expressly authorized injunctive relief by statute, there is no issue of whether a plaintiff has standing to seek that injunctive remedy.

No authority is cited for this sweeping proposition. Indeed, there is none. Her argument improperly equates a grant of standing to seek injunctive relief to qualified ADA plaintiffs with a blanket grant to *all* plaintiffs who can allege a past ADA discrimination. Yet, Congress's authorization of injunctive relief for the former does not necessarily or even logically lead to the conclusion that Congress authorized injunctive relief for the latter. Nothing in the ADA or its legislative history suggests an intent to allow individuals, in clear derogation of the *Lyons* principles, to obtain injunctions on the basis of past wrongdoing alone.

■ Furthermore, as *Lyons* itself suggests and more recent Supreme Court precedent makes clear,[10] Congress would not have had the power to expand standing in this way even had it chosen to do so. While Congress has the power to grant standing to plaintiffs who would not otherwise have it, there are limits to this power. Congress may, for example, properly confer standing by enacting statutes, the violation of which constitutes injury in fact. In effect, statutes of this sort create new rights, "the invasion of which creates standing." *Warth v. Seldin*, 422 U.S.

---

10. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 576–78, 112 S.Ct. 2130, 2136, 2144–46, 119 L.Ed.2d 351 (1992).

490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Indeed, this was the situation in *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), where the Supreme Court found that the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, gave the plaintiffs the right to live in an integrated neighborhood. Thus, when the defendants allegedly violated the statute by employing housing practices that discriminated against minorities, the violation resulted in an injury to the nonminority plaintiffs that was a sufficient basis to give them standing to sue. 409 U.S. at 208–12, 93 S.Ct. at 366–68.

■ It might appear at first glance that the ADA is similar to the statute at issue in *Trafficante:* the ADA, like the Civil Rights Act of 1968, plainly gives disabled persons the right to be free from discrimination in certain respects. In the ADA, the right created and at issue here is the right to be free from discrimination in the enjoyment of public accommodations and services. But the analogy extends no further than this similarity. Congressional creation of a right does not eliminate the constitutional requirement of standing to assert that right in court. As the Supreme Court has made clear, Congress cannot confer standing on persons who do not meet the requirements of Article III. *See, e.g., Lujan,* 504 U.S. at 560, 576–78, 112 S.Ct. at 2136, 2144–46; *Warth,* 422 U.S. at 500, 95 S.Ct. at 2205–2206. In sum, although Congress may expand the definition of what constitutes an injury, essentially by expanding the list of rights people enjoy, it may not eliminate the constitutional "case or controversy" requirement.

Yet, Ms. Hoepfl's interpretation of § 12188 would have Congress doing precisely what *Warth* and *Lujan* prohibit. Her past injury is not part of the calculus in determining whether she now has an injury sufficient to

justify injunctive relief. It is difficult at best to see how an injunction directed to Dr. Barlow in his Virginia office would be of any benefit to Ms. Hoepfl in North Carolina who no longer needs his services. In short, Ms. Hoepfl's asserted injury does not fulfill the requirements of Article III. In enacting the ADA, Congress thus could not have constitutionally elevated Hoepfl's past discrimination to the level of an injury cognizable by the federal courts.

■ Nor could Congress have given Ms. Hoepfl the right to raise the claims of other disabled persons who might be injured by Dr. Barlow's future discriminatory behavior. A private plaintiff may, under certain rather narrowly defined circumstances not present here, have standing to pursue the claims of third parties whose rights the defendant has violated or infringed. *See, e.g., Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). In these circumstances, however, the plaintiff must have herself suffered an Article III injury. In other words, the plaintiff's injury must satisfy the same core requirements of an injury in fact caused by the defendant and capable of being redressed by the court. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136.[11]

■ Beyond this, Ms. Hoepfl seems to claim that knowing Dr. Barlow may continue to discriminate against other disabled persons causes her to suffer mental or psychological injury, and that Congress gave her a right to be free from that injury when it empowered aggrieved persons to sue for an injunction. The short answer to this claim is that such an injury is exactly the type of undifferentiated harm or "generalized grievance" the Supreme Court has found insufficient to provide standing in a number of

---

11. The only difference with so-called "third party standing" is that the defendant's allegedly wrongful act or omission, while it violated the rights of the third parties, did not violate a right held by the plaintiff. It is the violation of the third party's right that produces the injury to the plaintiff. For example, the plaintiffs in *Craig* were licensed vendors of alcoholic beverages. They were injured by a state statute that prohibited them from selling alcohol to males under the age of twenty-one, although females could purchase alcohol after turning eighteen. The plaintiffs challenged the statute on equal protection grounds, but it constituted a violation of the rights of the third parties (the men in Oklahoma), not a violation of any rights held by the plaintiffs themselves. *See Craig,* 429 U.S. at 194–97, 97 S.Ct. at 455–57. Hoepfl's suit does not fit this paradigm of third-party standing.

other cases. *See, e.g., Lujan,* 504 U.S. at 573–74, 112 S.Ct. at 2143–44; *United States v. Richardson,* 418 U.S. 166, 176–77, 94 S.Ct. 2940, 2946–47, 41 L.Ed.2d 678 (1974); *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Any distress Hoepfl feels from anticipating that others might be hurt by Barlow's discrimination is "plainly undifferentiated and common to all members of the public" who are themselves disabled. *Richardson,* 418 U.S. at 176–77, 94 S.Ct. at 2946. Given the settled nature and weight of this precedent, Congress would have to speak with definite clarity if it meant to grant standing to a plaintiff with no particularized injury who wished to assert the rights of others not before the Court.[12] This statute is not an example of that definite clarity. Nothing in the language of either § 12188 or the cross-referenced § 2000a–3(a) suggests that it was intended to alter the normal prudential rules on standing.[13]

*Trautz v. Weisman,* 846 F.Supp. 1160 (S.D.N.Y.1994), cited by Ms. Hoepfl, is not to the contrary. In that case, the district court ruled, as this Court now rules, that an individual plaintiff claiming only a past violation of his rights has no standing to seek injunctive relief. *Trautz,* 846 F.Supp. at 1163–66. Still, that court allowed an organization called Disability Advocates, Inc. ("DAI") to pursue the claim for an injunction. The basis for this decision was a statute, the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII Act"), 42 U.S.C. § 10805, that expressly authorized DAI's suit. The statute allowed established state systems for the protection of the mentally ill (of which DAI was one) to pursue administrative, legal, and other appropriate remedies both "to ensure the protection of individuals with mental illnesses," 42 U.S.C. § 10805(a)(1)(B), and "on behalf of" those individuals, 42 U.S.C. § 10805(a)(1)(C). Thus, in the PAMII Act, Congress clearly and explicitly accorded

standing to entities like the DAI to vindicate the rights of third parties. By contrast, the applicable provision of the ADA does not mention the rights of others when it gives an aggrieved person the right to bring suit; instead, it merely states that the remedies in the cross-referenced statute are the remedies the subchapter affords *"to any person who is being subjected to discrimination."* *See* 42 U.S.C. § 12188(a)(1) (emphasis supplied). Thus, the ADA only authorizes a plaintiff to bring suit to vindicate her *own* rights.

Reported case law addressing the question of injunctive relief for past discrimination under the ADA is scant. The few district courts that have faced the issue, however, have come to the same conclusion reached here: a plaintiff who cannot demonstrate a likelihood that she will ever again suffer discrimination at the hands of a defendant, even one who has discriminated against her in the past, does not have standing to obtain an injunction under the ADA. *Schroedel v. New York University Medical Center,* 885 F.Supp. 594, 598–99 (S.D.N.Y.1995); *Hutchinson v. U.P.S.,* 883 F.Supp. 379, 398 (N.D.Iowa 1995); *Aikins,* 843 F.Supp. at 1333–34.

### IV.

The Court's resolution of the standing issue is buttressed by the ADA's language and structure, which reflect Congress's intent that the ADA not be used as a vehicle for private plaintiffs to obtain injunctive relief on the basis of past discrimination alone. The provision that cross-references the Civil Rights Act section authorizing injunctive relief states that the relief is available "to any person who *is being subjected* to discrimination" under the public accommodations subpart or who reasonably fears that she is about to be discriminated against in violation of § 12183, which applies only to the physical construction and alteration of public facilities.

---

12. As Justice Kennedy noted in *Lujan,*

Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.... In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit.

*Lujan,* 504 U.S. at 580, 112 S.Ct. at 2146–47 (Kennedy, J., concurring).

13. The structure of the remedial provision, § 12188, lends further support to the conclusion that it was not meant to allow individual citizens to sue on behalf of the general populace. *See infra* part IV.

42 U.S.C. § 12188(a)(1) (emphasis supplied). The next paragraph does appear to allow for broad injunctive relief of the sort plaintiff requests, stating that "where appropriate, injunctive relief shall also include requiring ... modification of a policy." *See* 42 U.S.C. § 12188(a)(2). This paragraph, however, applies only to architectural and structural barriers that violate the ADA, not to discrimination in the denial of services.

These two paragraphs comprise part (a), the general provision of the enforcement section. Part (b) turns to the subject of enforcement by the Attorney General. Under this provision, the Attorney General may bring a civil suit in federal district court "[i]f the Attorney General has reasonable cause to believe that ... any person or group of persons has been discriminated against under this subchapter *and such discrimination raises an issue of general public importance.*" 42 U.S.C. § 12188(b)(1)(B) (emphasis supplied). Here, then, is the lawsuit on behalf of the public good that Ms. Hoepfl urges is necessary to achieve the purposes of the ADA. It is noteworthy, however, that the statute specifically contemplates the Attorney General bringing these general suits. The combination of § 12188(a)(1) and § 12188(b)(1)(B) is highly instructive: the former, which authorizes individual plaintiffs to seek injunctions, is cast in terms of ongoing discriminatory treatment; the latter, which authorizes the Attorney General to seek relief, is cast in terms of discriminatory treatment that occurred in the past.

Ms. Hoepfl argues that this interpretation cannot be correct because, if it were, the ADA would effectively leave someone in her position without a remedy for past discrimination. This argument is simply incorrect. The enforcement provision grants the courts authority to "award such other relief as the court considers to be appropriate, including monetary damages to persons aggrieved when requested by the Attorney General." 42 U.S.C. § 12188(b)(2)(B). Persons alleging past discrimination, as Ms. Hoepfl does, can thus seek redress by persuading the Attorney General to sue under § 12188(b) and to seek relief in the form of both an injunction to prevent others from suffering discrimina-

tion and damages to compensate her as a person aggrieved by past discrimination. Ms. Hoepfl may reasonably regard this avenue of relief as impractical or unrealistic for obvious reasons; it is, nonetheless, an appropriate avenue and the one Congress chose to enact.

Thus, the scheme Congress enacted to enforce the ADA envisions action by the Attorney General to obtain relief to benefit the disabled community at large. In enacting the statute, Congress did not intend to alter traditional rules governing when a plaintiff has standing to pursue her claim. Dr. Barlow's motion to dismiss must therefore be granted with respect to Count I of the complaint.

An appropriate Order will issue.